IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DANIEL GENE THOMAS,

                  Plaintiff,                        CV-05-1059-ST

      v.                                       FINDINGS AND
                                            RECOMMENDATIONS

CITY OF PORTLAND, OFFICER PETER Z.
TAYLOR, OFFICER CHRISTOPHER GJOVIK,
OFFICER MICHELE  MICHAELS, DOES 1-20,

                  Defendants.

STEWART, Magistrate Judge:

## **INTRODUCTION**

      Plaintiff, Daniel Gene Thomas ("Thomas"), seeks to recover damages from defendants

the City of Portland, three of its police officers, Peter Z. Taylor ("Taylor"), Christopher Gjovik

("Gjovik"), and Michele Michaels ("Michaels"), and "Does 1-20" for unlawfully detaining and

arresting him on July 11, 2003, using excessive force to do so, and then maliciously prosecuting

him.  The Complaint alleges claims under 42 USC § 1983 for violations of the Fourth, Fifth, and

1 - FINDINGS AND RECOMMENDATIONS

Fourteenth Amendments (First and Second Causes of Action) and state law claims for assault

and battery (Third Cause of Action), intentional infliction of emotional distress (Fourth Cause of

Action), and negligence (Fifth Cause of Action) against all defendants.  It also alleges claims

against the individual defendants for malicious prosecution in violation of § 1983 (Sixth Cause

of Action) and state law (Seventh Cause of Action).  The claims of municipal liability under

§ 1983 against the City of Portland have been bifurcated for discovery and trial based on the City

of Portland's willingness to admit to *respondeat superior* liability upon the finding of a

constitutional violation by any individual defendant (docket # 43).

　　　This court has original jurisdiction under 28 USC § 1331 and supplemental jurisdiction

under 28 USC § 1367.

　　　The parties have filed cross-motions for summary judgment.  Thomas seeks partial

summary judgment against defendants on his First Cause of Action under 42 USC § 1983 for

violating his Fourth and Fourteenth Amendment rights (docket # 56).  Defendants seek summary

judgment on all claims, except those relating to excessive force (§ 1983 Fourth Amendment

claim and state law claims for battery and negligence) (docket # 60).  For the reasons set forth

below, Thomas's motion should be denied and defendants' motion should be granted except as to

punitive damages.

## STANDARDS

　　　FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any

material fact and "the moving party is entitled to judgment as a matter of law."  The moving

party must show an absence of an issue of material fact.  *Celotex Corp. v. Catrett*, 477 US 317,

323 (1986).  Once the moving party does so, the nonmoving party must "go beyond the

pleadings" and designate specific facts showing a "genuine issue for trial." *Id* at 324, citing

FRCP 56(e). The court must "not weigh the evidence or determine the truth of the matter, but

only [determine] whether there is a genuine issue for trial." *Balint v. Carson City*, 180 F3d 1047,

1054 (9th Cir 1999) (citation omitted). A "'*scintilla* of evidence,' or evidence that is 'merely

colorable' or 'not significantly probative,'" does not present a genuine issue of material fact.

*United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*,

493 US 809 (1989) (emphasis in original) (citation omitted). The substantive law governing a

claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec.*

*Contractors Ass'n*, 809 F2d 626, 630 (9th Cir 1987). The court must view the inferences drawn

from the facts "in the light most favorable to the nonmoving party." *Id* (citation omitted).

## FACTS

### I.    Dispatch Calls

On June 11, 2003, Lark Lambert ("Lambert"), without identifying herself, called police

non-emergency dispatch to report that her neighbor connected his fence to the fence on her

property. Plaintiff's Exhibit 1 (911 Dispatch Call), p. 3.[1] The non-emergency dispatch operator

told Lambert that this was a civil matter, advised her not "to go out and undo the fence," and

referred her to small claims court and neighborhood mediation. *Id* at 3, 7-8, 11. Lambert

ignored this advice, entered Thomas's yard and confronted him about the fence.

---

[1] Citations to Plaintiff's Exhibits refer to the second set of amended exhibits (docket # 95) to the extent that they replace the original exhibits attached to the Declarations of Steven J. Sherlag (dockets # 58 & # 78).

After the confrontation, Lambert called 911 again and reported that her neighbor "came out of his garage with a gun"[2] and "took his hand and shoved [her] head backwards off his property," telling her that she "was on his property." *Id* at 13. She did not indicate that Thomas had pointed the gun at her or threatened her with it. Lambert did not identify herself personally, but gave her address. During the call, Lambert also reported that "the last two years I've had problems with this guy, camcorders in my front bedroom windows, shooting our kids with BBs. It's – it's ridiculous." *Id* at 15. The operator did not question Lambert further and told her that the police were on their way and that she should stay inside the house. *Id*.

Dispatch sent out a call that a "[c]omplainant confronted the neighbor about a fence, and the neighbor came out of the garage with a gun and grabbed the complainant by the head, and pushed her back off his property," prompting several officers, including the individual defendants, to respond to the incident. *Id* at 16. One of the first officers on the scene ran a check on the license plate of the car in the driveway, which came back clear and revealed that the car belonged to Thomas "five eleven, 195, born in '38." *Id* at 20.

Less than four minutes after the initial dispatch, another dispatcher updated the information with a text message sent to the mobile digital terminal ("MDT") in the patrol cars indicating that the caller had telephoned earlier complaining about her neighbor's fence and had been advised to take the dispute to court. Plaintiff's Exhibit 2 (CAD printout), p. 2. Officers Gjovik and Taylor likely read this dispatch, but Sargeant Thompson did not. Gjovik Aff, ¶ 2;

---

[2] Unbeknownst to Lambert and defendants, the gun was a replica Navy Colt that Thomas was showing to his friend, Sheila Bland. Thomas Depo (Plaintiff's Exhibit 8), p. 56; Bland Depo (Plaintiff's Exhibit 11), p. 11.

Taylor Aff, ¶ 3; Thompson Depo (Plaintiff's Exhibit 4), p. 34.[3]  Officer Michaels could not remember when she first received that information.  Michaels Depo (Plaintiff's Exhibit 5; Defendants' Exhibit B), p. 73.

## II.    Incident

At the scene, Sargeant Thompson briefly contacted Lambert who confirmed what she had told 911.  Thompson Depo, pp. 26-27; Thompson Aff, ¶ 3; Michaels Depo, pp. 82-85.  She also said that Thomas never pointed the gun at her and was "very agitated, probably intoxicated." Plaintiff's Exhibit 1, p. 29.  Sargeant Thompson relayed that information to the individual defendants who were in the staging area formulating a plan for how to approach Thomas. Thompson Depo, pp. 26-27; Michaels Aff, ¶¶ 3, 5.

The officers decided that Sargeant Thompson should phone Thomas and ask him to come out of the house, then walk him to the officers' position and take him into custody.  Thompson Depo, p. 35; Michaels Depo, pp. 82.  Sargeant Thompson telephoned Thomas and told him to come out of the house with his hands up because the police needed to talk to him.  Thomas Depo (Plaintiff's Exhibit 8), p. 80; Thompson Depo, pp. 44-45.  Thomas was polite, did not argue, and agreed to come outside with his hands up.  Thompson Depo, pp. 44-46.  When asked if he had any weapons, Thomas replied no.  *Id* at 45.  Sargeant Thompson concluded the call without asking Thomas anything about the incident with Lambert.  *Id*.

After the telephone call, Thomas immediately walked outside his garage door to speak to the police.  *Id* at 44-45; Michaels Depo, p. 131; Thomas Depo, p. 80.  He was wearing shorts, a t-

---

[3]  Both parties have submitted documents with various attachments.  Citations to affidavits, declarations, and depositions are identified by the last name of the affiant or deponent, and citations are to the paragraph(s) of the affidavit or declaration or page(s) of the deposition transcript.

shirt and socks, but no shoes.[4]  Michaels Depo , p. 142; Taylor Depo (Plaintiff's Exhibit 6;

Defendants' Exhibit C), p. 142; Plaintiff's Exhibit 7.  At that time, seven officers waited for

Thomas outside his house.  Michaels Depo, pp. 78-79; Taylor Depo , p. 118.  Three officers, one

of them (Officer Taylor) armed with a rubber bullet shotgun, stood near a group of parked patrol

cars just up the street from Thomas's house.  Michaels Depo, pp. 131-32; Taylor Depo, p. 133.

Two other officers were positioned in a driveway near Thomas's house, one armed with a rifle.

Jackson Depo (Plaintiff's Exhibit 9), p. 20; Taylor Depo, pp. 129, 132.  The officers pointed the

two firearms in Thomas's general direction and shouted commands at him to put his hands up

and walk toward them.  Gjovik Depo (Plaintiff's Exhibit 3; Defendants' Exhibit A),  pp. 139-

142; Gjovik Aff,  3..

        Thomas did not see anyone at first and walked part way to the end of the driveway when

he saw police cars in front of Lambert's house and up the street and also saw firearms pointed at

him by two officers.  Thomas Aff, ¶ 9.  He appeared incredulous and would stop intermittently

and make statements such as "What the hell is going on?" and "This is bullshit."  Michaels Depo,

pp. 165-66; Gjovik Aff, ¶ 3; Michaels Aff, ¶¶ 6- 7.  Multiple officers were yelling and giving

orders, and it was difficult for Thomas to understand what was being said.  Thomas Aff, ¶¶ 10,

13.  Sergeant Thompson heard a woman inside Thomas's house shouting that he was hard of

hearing and could not hear them.  Bland Depo (Plaintiff's Exhibit 11), pp. 19-20; Thompson

Depo, p. 54; Thompson Aff, ¶ 6.  Because Thomas turned his head to look at each officer who

---

[4] The parties dispute whether the t-shirt was tucked or untucked.  Plaintiff's Exhibit 7; Michaels' Depo, p. 143.

was talking to him, Sargeant Thompson was satisfied that there was no communication problem. Thompson Aff, ¶ 6.

As Thomas walked, his hands drifted down more than once, causing officers to tell him to put his hands up, which he did. Gjovik Depo, pp. 139; Michaels Depo, pp. 150-51, 154; Taylor Depo, pp. 181-82; Thompson Aff, ¶ 5. The officers told Thomas more than once to place his hands on his head or to interlock his fingers on his head because his hands were moving down. Michaels Depo, p. 152; Gjovik Aff, ¶ 3; Taylor Aff, ¶¶ 5-6. Thomas admits that due to his confusion, he may have "lowered [his] hands somewhat." Thomas Aff, ¶ 12. According to a neighbor, Thomas's arms drifted from the shape of "parentheses" to a capital "L." Kline Depo (Plaintiff's Exhibit 10), p. 47. Officer Gjovik could not recall how far Thomas's hands dropped, but his report indicates they went near his waist. Gjovik Depo, p. 139. Officer Michaels saw Thomas's hands drop once between his chest and waist, "the '60th percentile' where weapons are usually kept." Michaels Depo, p. 166; Michaels Aff, ¶ 6. Officer Taylor saw Thomas's hands go down near his waist. Taylor Depo, p. 181; Taylor Aff, ¶ 5.

Defendants did not see a weapon on Thomas or a bulge in his clothing that would indicate he had a weapon. Gjovik Depo, pp. 131, 135; Taylor Depo, p. 197; Michaels Depo, pp. 177-78. Although Officer Taylor did not have a clear view of Thomas's waistband, none of the defendants saw Thomas reach into his waistband. Gjovik Depo, p. 133; Taylor Depo, p. 197; Michaels Depo, p. 183.

Officer Taylor, who held the non-lethal shotgun, warned Thomas that he would be shot with a bean bag round if he did not keep his hands up. Gjovik Depo, p. 146; Taylor Depo, p. 189. At some point, Officer Gjovik told Thomas to stop walking forward and Thomas

complied.  Gjovik Aff, ¶ 4.  Officer Gjovik ordered Thomas to turn around, kneel, and put his

hands behind his head.  Thomas Aff, ¶ 14; Gjovik Aff, ¶ 4.  Defendants then approached Thomas

to handcuff him and take him into custody.  Gjovik Depo, pp. 140, 149; Taylor Depo, pp. 198,

200.  Thomas offered his right hand to Officer Gjovik who placed it in a wrist lock.  Thomas Aff,

¶ 14; Gjovik Aff, ¶ 4.

At this point, the parties' versions of the facts differ.  Thomas recalls that he asked to be

cuffed in front and when asked why, explained that he could not put his arms behind his back as

he had previously broken his collar bone.  Thomas Aff, ¶ 14.  Officer Taylor said "Take him

down" and all of a sudden the officers took him to the ground, shoving his head into the ground

and telling him to put his left arm behind his back.  *Id*. While he was on the ground, Officer

Taylor stepped on his left foot two times, kneed or kicked him in the upper left arm, jerked his

left arm behind his back and up to his shoulder blade, and then either kicked or kneed him in the

back.  *Id* at ¶ 16.

Defendants recall that when placing Thomas's right hand in a wrist lock, Thomas started

to tense up, flex his muscles, and resist.  Gjovik Aff, ¶ 4.  As Officer Michaels put a handcuff on

Thomas's right wrist and began to put one on his left wrist, Thomas started to swear and pull

away with his left arm.  Michaels Aff, ¶ 7; Taylor Aff, ¶ 7.  Officers Gjovik and Taylor told him

to relax and stop resisting.  Gjovik Aff, ¶ 4; Taylor Aff, ¶ 7.  Officer Taylor stepped on Thomas's

foot twice to distract him.  Taylor Aff, ¶ 7.  Because Officer Michaels was still not able to control

Thomas's left arm, Officer Taylor told Officer Gjovik to "take him down."  *Id*.  They then

pushed Thomas towards the ground.  *Id*.  Officer Gjovik put pressure on Thomas's right shoulder

and then pinned it to the ground with his knee to restrict his mobility.  Gjovik Aff, ¶ 4.  While

8 - FINDINGS AND RECOMMENDATIONS

squatting down next to Thomas's left shoulder, Officer Taylor kneed Thomas in the upper left arm twice to gain compliance. Taylor Aff, ¶ 8. When Thomas bent over, his left arm relaxed and Officer Michaels was able to handcuff him. *Id* at ¶ 8. Officer Michaels recalls Thomas being handcuffed by the time he was on the ground and does not remember seeing him prone, face down on the pavement. Michaels Aff, ¶ 8.

When a neighbor, Barbara Kline, saw Officer Taylor step on Thomas's foot and begin to pull his leg back, she became very concerned that Thomas would be kicked and yelled: "Get the camcorder." Barbara Kline Depo (Plaintiff's Exhibit 15), pp. 29, 31. She did not have a camcorder, but wanted to make the officers aware of her presence. *Id* at 31. At that point, defendants all seemed to step back. *Id*.

According to the CAD printout, about three minutes elapsed from the time Officer Michaels advised that Thomas was being asked to come out of his house until Sargeant Thompson notified dispatch that Thomas was in custody. Noll Aff, ¶¶ 5-6.

After being handcuffed, Thomas was brought to a standing position and placed in a police car while Officer Michaels conducted an investigation. Michaels Aff, ¶ 9. Officer Michaels talked to Lambert and the woman who lived with Thomas (Sheila Bland). *Id*. Lambert confirmed that Thomas had held a gun in his hand as he came towards her and then struck her in the face with his other hand. *Id*, ¶ 10. She also said that she had experienced difficulties with Thomas since moving in about two years before. *Id*. He often yelled at her and others at her house, calling her "bitch," "dyke," and "queer." *Id*. Lambert reported Thomas saying that he "doesn't like 'dykes' living next to him.'" *Id*. She also said that Thomas had dumped a bunch of

garbage onto their yard on one occasion and then called her a "fucking queer" when she confronted him about it.  *Id*.

Officer Michaels then drove Thomas to the East Precinct police station to interview him after giving him his Miranda rights.[5]  *Id*, ¶ 9.  From her initial contact with Thomas, she noticed that his breath smelled like alcoholic beverages and his speech was slurred.  *Id*.  Thomas admitted shoving Lambert off his property with a gun in his hand as reported by Lambert. Michaels Supplemental Aff, ¶ 3.  He also used similar language as Lambert in describing his interactions with her.  Michaels Aff, ¶ 10.  After her investigation, Officer Michaels arrested Thomas for Assault IV (ORS 163.160),[6] Menacing (ORS 163.190),[7] and Intimidation II (ORS 166.155).[8]  *Id*.

---

[5]  The record does not explain why Officer Michaels took Thomas to the police station, rather than interviewing him at the scene.

[6]  ORS 163.160 Assault in the fourth degree.
(1) A person commits the crime of assault in the fourth degree if the person:
    (a) Intentionally, knowingly or recklessly causes physical injury to another; or
    (b) With criminal negligence causes physical injury to another by means of a deadly weapon.
(2) Assault in the fourth degree is a Class A misdemeanor. . .

[7]  163.190 Menacing.
(1) A person commits the crime of menacing if by word or conduct the person intentionally attempts to place another person in fear of imminent serious physical injury.
(2) Menacing is a Class A misdemeanor.

[8]  ORS 166.155 Intimidation in the second degree
(1) A person commits the crime of intimidation in the second degree if the person:
    (a) Tampers or interferes with property, having no right to do so nor reasonable ground to believe that the person has such right, with the intent to cause substantial interference to another because of the person's perception of the other's race, color, religion, national origin or sexual orientation;
    (b) Intentionally subjects another to offensive physical contact because of the person's perception of the other's race, color, religion, national origin or sexual orientation; or
    (c) Intentionally, because of the person's perception of race, color, religion, national origin or sexual orientation of another or of a member of the other's family, subjects such other person to alarm by threatening:
        (A) To inflict serious physical injury upon or to commit a felony affecting such other person, or a member of the person's family; or
        (B) To cause substantial damage to the property of the other person or of a member of the other person's family.
(2) Intimidation in the second degree is a Class A misdemeanor.

(continued...)

At some point, an unidentified male officer also questioned Barbara Kline, and Brenda

Kline also spoke with three unidentified officers (two males and one female). Barbara Kline

Depo, p. 40; Brenda Kline Depo (Plaintiff's Exhibit 16, p. 46).

As a result of his injuries, Thomas felt severe pain, sought medical attention, and has

suffered complications, requiring an extensive course of treatment. Thomas Aff, ¶¶ 17-20 &

Exhibit 2; Plaintiff's Exhibit 22.

### III.   Prosecution

Deputy District Attorney Lavin ("Lavin") prosecuted Thomas for four misdemeanors.

Although he charged Thomas with Menacing (ORS 163.190), one of the crimes for which he was

arrested, he did not charge Thomas with the other two crimes of Assault IV or Intimidation II.

Instead, he charged him with Attempted Assault IV (ORS 163.160), Interfering with a Police

Officer (ORS 162.247)[9] and Harassment (ORS 166.065).[10] Lavin Aff, ¶¶ 5-8. The prosecution

---

[8](...continued)
(3) For purposes of this section:
    (a) "Property" means any tangible personal property or real property.
    (b) "Sexual orientation" means heterosexuality, homosexuality or bisexuality.

[9] ORS 162.247 Interfering with a peace officer or parole and probation officer.
(1) A person commits the crime of interfering with a peace officer or parole and probation officer if the person, knowing that another person is a peace officer or a parole and probation officer as defined in ORS 181.610:
    (a) Intentionally acts in a manner that prevents, or attempts to prevent, a peace officer or parole and probation officer from performing the lawful duties of the officer with regards to another person; or
    (b) Refuses to obey a lawful order by the peace officer or parole and probation officer.
(2) Interfering with a peace officer and parole and probation officer is a Class A misdemeanor. . .

[10] ORS 166.065 Harassment.
(1) A person commits the crime of harassment if the person intentionally:
    (a) Harasses or annoys another person by:
        (A) Subjecting such other person to offensive physical contact; or
        (B) Publicly insulting such other person by abusive words or gestures in a manner intended and likely to provoke a violent response;
    (b) Subjects another to alarm by conveying a false report, known by the conveyor to be false, concerning death or serious physical injury to a person, which report reasonably would be expected to cause alarm; or
    (c) Subjects another to alarm by conveying a telephonic, electronic or written threat to inflict serious physical injury on that person or to commit a felony involving the person or property of that person or any member of
                                        (continued...)

was based on evidence provided by the police reports and by Lambert over the telephone. *Id* at ¶ 10. Lavin was unaware that Lambert had made the first 911 call or that Lambert had confirmed that the gun was never pointed at her. Lavin Depo (Plaintiff's Exhibit 17), pp. 62, 64. He also was unaware that either Barbara or Brenda Kline had witnessed the incident and that they were interviewed by some officers. *Id*, pp. 43, 52.

A jury trial was held October 21-23, 2003, in Multnomah County Circuit Court. Defendants' Exhibit E. At the close of the State's case, Judge La Barre denied Thomas's motion for a judgment of acquittal. Lavin Aff, ¶ 9. The jury returned a verdict of acquittal in favor of Thomas on all charges.

## FINDINGS

### I.    Unreasonable Seizure

#### A.    Constitutional Standards

Although Thomas alleges that defendants violated his constitutional rights under the Fourth, Fifth and Fourteenth Amendments, only the Fourth Amendment applies to the legality of his seizure. In general, the due process clause of the Fifth Amendment applies to the actions of the federal government. *See Dusenbery v. United States*, 534 US 161, 167 (2002). "In any event, the rights set forth in the Fifth Amendment substantially duplicate those set forth in the

---

[10](...continued)
that person's family, which threat reasonably would be expected to cause alarm.
(2) A person is criminally liable for harassment if the person knowingly permits any telephone or electronic device under the person's control to be used in violation of subsection (1) of this section.
(3) Harassment is a Class B misdemeanor.
(4) Notwithstanding subsection (3) of this section, harassment is a Class A misdemeanor if a person violates subsection (1) of this section by subjecting another person to offensive physical contact and the offensive physical contact consists of touching the sexual or other intimate parts of the other person.

Fourteenth Amendment." *Picray v. City of Coburg*, 2006 WL 1143081, *3 (D Or 2006). "A

claim for a substantive due process violation arising out of an allegedly unreasonable seizure

would properly be brought under the Fourth Amendment, not the Fourteenth Amendment." *Id*

(citations omitted). Accordingly, Thomas's claims that he was unreasonably seized should be

construed only as a Fourth Amendment claim, applicable to the states by the Fourteenth

Amendment.

     The Fourth Amendment protects "[t]he right of people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures . . ." A brief, consensual

stop by police to question a citizen is not a seizure, so long as a reasonable person would feel free

"to disregard the police and go about his business." *Florida v. Bostick*, 501 US 429, 434 (1991)

(citation omitted). However, two other types of nonconsensual stops by police are considered

seizures under the Fourth Amendment.

     First, police may seize a person for a brief investigatory stop when the officer has a

"reasonable suspicion" to believe that the individual has committed wrongdoing. *See Terry v.*

*Ohio*, 392 US 1, 23-27 (1968). This is commonly referred to as a *Terry* stop. To justify such a

seizure, the officer must point to specific and articulable facts, together with rational inferences

drawn from those facts, which reasonably suggest that criminal activity has occurred or is

imminent, even if the officer lacks probable cause. *Id*; *see also United States v. Sokolow*, 490

US 1, 7 (1989).

     Second, a police officer may arrest an individual without a warrant when the officer has

probable cause to believe the individual has committed or is committing a crime. *United States*

*v. Wilson*, 423 US 411 (1976); *see also Allen v. City of Portland*, 73 F3d 232, 235 (9th Cir 1995) .

13 - FINDINGS AND RECOMMENDATIONS

Probable cause exists when "the facts and circumstances within [the officers'] knowledge and of they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offence." *Beck v. Ohio*, 379 US 89, 91 (1964) (citations omitted). It requires only a "fair probability" or "substantial chance" of criminal activity, not an actual showing that such activity occurred. *Murdock v. Stout*, 54 F3d 1437, 1441 (9th Cir 1995) (citation omitted). In determining probable cause, the court must examine the totality of the circumstances known to the officers at the time of their actions. *Devenpeck v. Alford*, 543 US 146, 152-53 (2004); *Murdock*, 54 F3d at 1441. An arresting officer's subjective reasons for making the arrest are irrelevant to the existence of probable cause. *Devenpeck*, 543 US at 153.

### B.    Parties' Claims

The parties disagree whether Thomas was subjected to a *Terry* stop, requiring reasonable suspicion, or was placed under arrest, requiring probable cause. In either event, Thomas contends that his detention was unlawful in violation of the Fourth Amendment. Even if defendants had a reasonable suspicion to conduct a *Terry* stop, Thomas contends that their intrusive and aggressive conduct constituted an arrest in violation of the Fourth Amendment.

Defendants respond that at the outset, they stopped and detained Thomas solely for investigation based on at least a reasonable suspicion of his possible criminal behavior. Although conceding that Thomas was not free to leave, defendants contend that the use of force did not convert the *Terry* stop into an arrest. In any event, defendants also argue that there was probable cause to arrest Thomas.

### C.    Whether Defendants had a Reasonable Suspicion to Detain

Even if he was subjected only to a *Terry* stop when surrounded at gunpoint by police officers outside his house, Thomas contends that defendants lacked a reasonable suspicion to believe that he had committed a crime.

First, he argues that defendants relied solely on an uncorroborated 911 report from an unidentified caller and knew, based on the updated MTD report four minutes later, that the caller had telephoned earlier complaining about Thomas's fence and was advised to go to court or mediation. However, Lambert was not some anonymous informant, but gave her address and also confirmed with Sargeant Thompson the information she had given the 911 dispatcher. Sargeant Thompson's observations of Lambert were consistent with someone who had seen a gun and was scared. Thompson Aff, ¶ 3. Furthermore, not all of the officers were aware of Lambert's non-emergency 911 call earlier that day. Even had they all been aware of it, the fact that Lambert and Thomas had been contentious neighbors in the past does not obviate the need to investigate the escalation of a property dispute involving physically aggressive behavior and a gun.

Second, Thomas argues that the information received by defendants did not reliably indicate that he had committed any crime. Based on ORS 161.255,[11] he asserts a complete defense to any possible crime because, as a property owner, he had the right to use reasonable force to keep others off his property. Contending that not every push or shove is a crime, even with a gun in hand, Thomas chastises defendants for not investigating further to find out why he

---

[11] ORS 161.225  Use of physical force in defense of premises.
(1)  A person in lawful possession or control of premises is justified in using physical force upon another person when and to the extent that the person reasonably believes it necessary to prevent or terminate what the person reasonably believes to be the commission or attempted commission of a criminal trespass by the other person in or upon the premises. . .

had pushed Lambert off his property.  However, Lambert had reported being threatened and physically attacked by Thomas who was carrying a gun.  Until they could safely proceed with an investigation by disarming and talking to Thomas, defendants were not in a position to determine who was on whose property at the time of the incident or whether Lambert was criminally trespassing on Thomas's property.  Based solely on Lambert's report of Thomas's threatening behavior and offensive physical contact with gun in hand, they could reasonably suspect that Thomas had possibly committed at least one of the crimes of assault, unlawful use of a weapon, harassment, menacing, or disorderly conduct.[12]  Michaels Depo, p. 255; Gjovik Depo, pp. 215-16, 221, 225.

Therefore, this court finds that defendants had a reasonable suspicion to stop and detain Thomas for an investigation.

### D.    When Investigative Stop Turned Into Arrest

Thomas contends that the use of force turned the investigative *Terry* stop into an arrest. The parties disagree at what point the arrest occurred.  According to Officer Michaels, she arrested Thomas at the police station after completing her investigation and concluding he had committed a crime.  According to Thomas, an arrest occurred the minute he stepped outside his house and was surrounded at gunpoint.  At that point, he claims that defendants could readily discern that he was elderly and unarmed and no longer had any legitimate fear for their safety.

---

[12] ORS 166.025  Disorderly conduct in the second degree.
(1) A person commits the crime of disorderly conduct in the second degree if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, the person:
(a) Engages in fighting or in violent, tumultuous or threatening behavior; . . .

Even if he was not arrested at that point, Thomas argues that he was arrested when placed in handcuffs or in the patrol car, prior to any investigation by Officer Michaels.

There is "no bright-line rule for determining when an investigatory stop crosses the line and becomes an arrest." *United States v. Parr*, 843 F2d 1228, 1231 (9th Cir 1988). Instead, it requires a "fact-specific" inquiry. *Washington v. Lambert*, 98 F3d 1181, 1185 (9th Cir 1996). *Allen*, 66 F3d at 1185. Courts may allow "intrusive and aggressive police conduct without deeming it an arrest . . . when it is a *reasonable* response to legitimate safety concerns on the part of the investigating officers." *Id* at 1186 (emphasis in original). In the course of a *Terry* stop, police officers are entitled to employ reasonable measures to protect themselves and others in potentially dangerous situations. *Allen v. City of Los Angeles,* 66 F3d 1052, 1056-57 (9th Cir 1995). This includes a pat down for weapons if the officer has a reasonable suspicion that the person "may be armed and presently dangerous." *Terry*, 392 US at 30. It also includes other "measures used to restrain individuals, such as stopping them at gunpoint and handcuffing them." *Alexander v. County of Los Angeles*, 64 F3d 1315, 1320 (9th Cir 1995). "A brief, although complete, restriction of liberty, such as handcuffing during a Terry stop is not a de facto arrest, if not excessive under the circumstances. Likewise, placing a person in a patrol car is not necessarily an arrest." *Haynie v. County of Los Angeles*, 339 F3d 1071, 1077 (9th Cir 2003) (citations omitted).

A search for weapons is justified by the "immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him. Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." *Terry*, 392

US at 23. The relevant inquiry is "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id* at 27.

At issue here is when a reasonably prudent police officer should have concluded that Thomas was not armed. Thomas argues that any initially heightened concern about Thomas being armed quickly dissipated. The plate check on Thomas's car came back clear. When called and asked to come outside, Thomas responded politely and was compliant with the request. He came out and displayed his hands and body such that the defendants could see that he was not armed, had no bulge consistent with a weapon and, being elderly and hard of hearing, should have been perceived as posing no threat.

Simply because Thomas's license plate was clear and Thomas was polite on the telephone did not remove the threat he presented as a previously armed and probably intoxicated suspect. Lambert confirmed that Thomas had a gun in his hand when he shoved her. Thus, defendants had reliable information that Thomas had been armed the last time he had been seen and continued to have access to a gun. The presence of a gun, especially combined with alcohol use, clearly poses a safety threat.

The presence of two drawn guns as Thomas left his house was for legitimate safety reasons in the event that he came out firing a weapon. The need to safely protect the officers and the public did not disappear simply because Thomas came out of his house with his hands up. Thomas's initial compliance did not last long. Not only was he angry and swearing at the officers, but his hands drifted down near his waist where weapons are often kept which presented a significant safety concern. Although defendants could see no bulges in Thomas's clothing, they were concerned that he might have hidden a gun in his underwear. Gjovik Depo, pp. 81,

312.  When Thomas was told to turn around and kneel, he resisted their efforts to handcuff him and continued being verbally abusive.  As a result, force was used to handcuff him and place him in a patrol car for the permissible purpose of conducting a safe investigation.

It is true that the situation could have been handled differently, especially given the lack of exigent circumstances.  Defendants could have simply asked Thomas to turn around in order to frisk him for weapons.  Had Thomas consented (which is unknown), any use of force to handcuff him might have been avoided.  But that possible scenario does not mean that initially detaining Thomas at gunpoint and then handcuffing him turned the *Terry* stop into an arrest requiring more than a reasonable suspicion.  Defendants had a reasonable suspicion that Thomas had committed a crime and was carrying a real (as opposed to a replica) gun, which is all that is required for a protective search under *Terry*.  The availability of less intrusive means to achieve the objectives of an investigation does not automatically render a *Terry* stop unreasonable.  The "question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it."  *United States v. Sharpe*, 470 US 675, 687 (1985); *see also United States v. Gallagos*, 308 F3d 987, 993 (9th Cir 2002) (holding that officers acted reasonably when they ordered a suspect who resembled a burglar in the area out of his car at gunpoint, handcuffed him, immediately drove him to the crime scene for identification, and released him as soon as they confirmed his identity).

The facts here are distinguishable from the cases relied upon by Thomas.  In *United States v. Strickler*, 490 F2d 378 (9th Cir 1974), the court held that a suspect was arrested when officers surrounded his car, pointed weapons at him and ordered him to put his hands up because he parked near a residence where a cocaine transaction was occurring.  Similarly in *United States*

*v. Robertson*, 833 F2d 777 (9th Cir 1987), the court held a suspect was arrested when seven officers surrounded her with weapons drawn merely because they saw her walk down a path leading from a house where they suspected criminal activity. In neither of those cases did the officers have information, as in this case, that the suspect had been involved in a physical confrontation with his neighbor with a gun in his hand.

Given the presence of a reported gun, this case is closer to *United States v. Taylor*, 716 F2d 701 (9th Cir 1983), which held that pointing a gun on a suspect and making him get out of a car and lie down in a ditch, where he was frisked and handcuffed, did not transform the stop into an arrest where the officers had reason to think that he was armed. Unlike Thomas, the suspect in *Taylor* was a confirmed amphetamine manufacturer, but he, like Thomas, posed a potential danger to the officers and the public.

Thus, this court finds that detaining Thomas at gunpoint, handcuffing him, and placing him in the back of a patrol car did not turn the investigatory detention into an arrest because it was a reasonable response to legitimate safety concerns by defendants.

### D.    Probable Cause to Arrest

It is clear that defendants did not have probable cause to arrest Thomas for committing a crime based solely on Lambert's 911 call and the brief conversation between Lambert and Sargeant Thompson. While officers may rely on information supplied by an identified citizen who volunteers information for a *Terry* stop (*Adams v. Williams*, 407 US 143, 147 (1972)), they cannot establish probable cause by relying solely on the claim of a citizen witness that she or he was a victim of a crime. *Fuller v. M.G. Jewelry*, 950 F2d 1437, 1444 (9th Cir 1991). Rather, officers must independently examine the basis of the witness's knowledge, interview other

witnesses, or conduct other investigation.  *Id*; *see also Arpin v. Santa Clara Valley Transp.*
*Agency*, 261 F3d 912, 925 (9th Cir 2001).

However, as discussed above, the *Terry* stop did not turn into an arrest until after Thomas
was handcuffed and Officer Michaels conducted an investigation.  As part of this investigation,
Officer Michaels talked to both Lambert and Thomas.  Based on that investigation, Officer
Michaels had probable cause to arrest Thomas for Assault IV, Menacing and Intimidation II.

Officer Michaels had probable cause to arrest Thomas for Assault IV because her
investigation showed that he intentionally caused physical injury to Lambert by striking her in the
face with his left hand (open hand) catching her in the chin, mouth, nose area which threw her
head back sharply before he pushed her away.  Michaels Aff, ¶ 10.  She had probable cause to
arrest Thomas for Menacing because her investigation showed that he intentionally attempted to
place Lambert in fear of imminent serious physical injury by having a gun in his hand which
came up towards her as he shoved her away.  *Id*.  She had probable cause to arrest Thomas for
Intimidation II because she reasonably believed that he had subjected Lambert to offensive
physical contact based on his opinion of her sexual orientation.  *Id*.  Lambert told her that she had
experienced difficulties with Thomas for about two years.  *Id*.  She said he often yelled at her and
others at her house, calling her "bitch," "dyke," and "queer,." and had told her that he "doesn't
like 'dykes' living next to him."  *Id*.  Lambert also reported that Thomas dumped a bunch of
garbage onto their yard on one occasion and then called her a "fucking queer" when she
confronted him about it.  *Id*.  Thomas used similar language in describing the situation to Officer
Michaels.  *Id*.

21 - FINDINGS AND RECOMMENDATIONS

Thus, Thomas's arrest after Officer Michaels's investigation, was based on probable cause and does not violate the Fourth Amendment as a matter of law.

## II.    **Malicious Prosecution Claims**

### A.    **Federal Claim**

A claim for malicious prosecution or abuse of process is not generally cognizable under § 1983 if process is available within the state judicial system to provide a remedy.  *Usher v. City of Los Angeles*, 828 F2d 556, 561 (9th Cir 1987) (citations omitted).  The exception is "when a malicious prosecution is conducted with the intent to deprive a person of equal protection of the laws or is otherwise intended to subject a person to denial of constitutional rights."  *Id* (citations omitted).

In order to prevail on a § 1983 claim of malicious prosecution, a plaintiff  "must show that the defendants prosecuted [him] with malice and without probable cause, and that they did so for the purpose of denying [him] equal protection or another specific constitutional right." *Freeman v. City of Santa Ana,* 68 F3d 1180, 1189 (9th Cir 1995) (citations omitted).  Malicious prosecution actions are not limited to suits against prosecutors, but also may be "brought against other persons who have wrongfully caused the charges to be filed."  *Awabdy v. City of Adelanto*, 368 F3d 1062, 1066 (9th Cir 2004), citing *Galbraith v. County of Santa Clara*, 307 F3d 1119, 1126-27 (9th Cir 2002).

> Ordinarily, the decision to file a criminal complaint is presumed to result from an independent determination of the prosecutor, and, thus, precludes liability for those who participated in the investigation or filed a report that resulted in the initiation of proceedings. However, the presumption of prosecutorial independence does not bar a subsequent § 1983 claim against state or local officials who improperly exerted pressure on him, knowingly provided misinformation to the prosecutor, concealed exculpatory

> evidence, or otherwise engaged in wrongful or bad faith conduct that was
> actively instrumental in causing the initiation of legal proceedings.

*Awabdy*, 368 F3d at 1067.

Thomas argues that there is significant evidence to support his claim that the defendants' conduct was undertaken with an intent to deny his constitutional right to due process and a fair trial. He points to misrepresentations of fact supporting the charges, failure to adequately investigate the charges, and material omissions from the defendants' written and oral representations to the prosecutor. From this evidence, he believes that a jury can infer that the misconduct of the defendants was motivated by evil motive or intent and involved, at a minimum, the reckless and callous indifference to his federally protected rights. *See Galbraith* 307 F3d at 1126-27 (holding that allegations of a coroner's knowing or recklessly false statements led to his arrest and prosecution were sufficient to state a § 1983 claim); *Harris v. Roderick,* 126 F3d 1189, 1198 (9th Cir1997) (holding that a probable cause determination "that is 'tainted by the malicious actions of the government officials [involved]' does not preclude a claim against the officials involved").

Thomas claims that in her written report, Officer Michaels misrepresented as a "strike" Lambert's report that Thomas pushed or shoved her. Plaintiff's Exhibit 19, Bates No. 100005. In contrast, during cross-examination by Thomas's lawyer at the criminal trial, Lambert testified that Thomas shoved her and that she did not remember telling Officer Michaels that Thomas struck her. Defendants' Exhibit E, p. 30. However, Lambert repeatedly testified on direct examination that Thomas "slammed" her "in the head." *Id* at 7-9. In addition, Officer Michael's report includes the way both Thomas and Lambert reported the incident; she described being

"slammed" in the head and Thomas admitted that he shoved her.  Plaintiff's Exhibit 19,

pp. 100005-06.  Being slammed in the head is not so dissimilar from being struck in the head to

constitute a misrepresentation.

Thomas also contends that the investigation was inadequate because defendants: (1) did

not advise the prosecutor that there was an earlier non-emergency call from Lambert; (2) never

confirmed whether or not Lambert had a property interest in what she claimed was her property;

and (3) did not interview Sheila Bland or another witness, Roberta Whitaker, about an earlier

occasion when Thomas had excluded Lambert from his property.  Thomas also asserts that

defendants falsely reported the incident by excluding exculpatory information concerning Brenda

and Barbara Kline from their reports and withholding it from the prosecutor.  These assertions

are not supported by the record.

At the time of Thomas's arrest, Officer Michaels did not know about Lambert's earlier

non-emergency call and cannot remember when she first became aware of the fact that Lambert

had made such a call.  In any event, regardless of the prior interactions between Thomas and

Lambert, Lambert reported that Thomas had slammed her in the face while holding a gun.

Moreover, even Lambert did not initially recall at trial that she had made an earlier call to 911 on

the date of the incident in question.  Defendants' Exhibit E, p. 48.  Lavin testified that although

he would have relied on Officer Michaels to advise him if she was aware of the earlier call, "it's

likely she didn't" know about the earlier call.  Lavin Depo, pp. 46-47.  He also acknowledged

that Officer Michaels may not have known how this information "fit into the rest of the case."  *Id*

at 47.  Furthermore, even if Officer Michaels failed to reveal the earlier call to Lavin, he had

independent access to the 911 dispatch records, but did not review the dispatch calls related to

this case prior to the criminal trial. *Id* at 38. Due to his inexperience he may not have known it was possible to review the dispatch calls, and, even if he had known that was an option, he might not have been able to get the information in time since he was specially assigned to the case only 11 days before trial. *Id* at 38-39.

With respect to ownership of the property, Kathy Hedmark was the owner and Lambert was only a renter without any agreed upon right to purchase the property and had no authority to make any decisions regarding the disputed fence on the property. Hedmark Aff, ¶¶ 1-3. However, Lambert was Thomas's next door neighbor. It was irrelevant whether she actually owned the property where she lived since Officer Michaels was investigating criminal activity, not resolving a property dispute. Michaels Affidavit, ¶ 6.

Officer Michaels's failure to interview other persons about an earlier occasion when Thomas had excluded Lambert from his property also causes little concern. She obtained background information about the past relationship between Thomas and Lambert from the three people she interviewed, including Sheila Bland who was living with Thomas at the time. Since the information she received from all three witnesses was consistent, Officer Michaels appropriately believed that she did not need to seek out any additional witnesses on this issue. Michaels Supp Aff, ¶¶ 2, 6.

Finally, it is far from clear that Officer Michaels withheld exculpatory information by not providing information about witnesses Barbara and Brenda Kline. Officer Michaels did not talk to anyone in the Kline family and had no reason to believe that anyone in that household had witnessed the interaction between Thomas and Lambert, which was the basis of the various charges for which Thomas was arrested. *Id*, ¶ 2. Additionally, Barbara and Brenda Kline

25 - FINDINGS AND RECOMMENDATIONS

witnessed some of the police contact with Thomas, but not the encounter between Thomas and

Lambert, and Barbara Kline admitted that she did not know what this incident was about.

Barbara Kline Depo, p. 37.

Moreover, it is evident that the criminal charges against Thomas resulted from an

independent determination of the prosecutor which was not influenced by any individual

interactions with defendants.  Lavin Aff, ¶¶ 3-8, 10.  In fact, Lavin, who prosecuted Thomas, had

no contact with Officers Taylor and Gjovik who were unavailable and did not testify at trial.  *Id*,

¶ 4.

This case is quite dissimilar to *Awabdy* in which the court refused to dismiss a malicious

prosecution claim under § 1983.  Two weeks before the plaintiff's bid to serve another term on

the City Council of Adelanto, the San Bernardino County District Attorney charged the plaintiff

with embezzling public funds.  The plaintiff pled not guilty prior to election day and, over one

year later, the Superior Court granted a motion by the prosecutor to dismiss the charges.  By that

time, the plaintiff was no longer serving on the City Council, having been defeated for election.

It was unclear why the prosecutor dismissed the charges against the plaintiff, leading to an

inference of undue influence exerted on the prosecutor for political reasons.  In contrast, here it is

clear that the Multnomah County District Attorney's Office made an independent prosecutorial

decision to pursue four misdemeanor criminal charges against Thomas.

Moreover, the trial judge denied the motions for judgment of acquittal because a

reasonable jury could find Thomas guilty of all four charges based on the evidence in the record

viewed in a light most favorable to the State.  Lavin Aff, ¶ 9.  This judicial determination

certainly supports the conclusion that the District Attorney's Office had probable cause to

proceed with criminal charges against Thomas.

Thus, this court concludes that defendants are entitled to summary judgment against

Thomas's malicious prosecution claim under § 1983 because the undisputed facts do not reveal

that Thomas was denied any federal constitutional rights based on any wrongful influence

exerted by defendants on the prosecutor.

**B.**    **State Claim**

To prevail on his state law claim of malicious prosecution, Thomas must allege and prove

by a preponderance of the evidence that defendants initiated a criminal proceeding "from an

improper motive and without probable cause, against another who is not guilty of the offense

charged, and who ultimately gains a favorable termination of the proceedings." *Rogers v. Hill*,

281 Or 491, 497, 576 P2d 328, 331-32 (1978). The issues presented here are whether defendants

lacked probable cause to initiate criminal charges against Thomas and acted with malice in

prosecuting criminal proceedings.

Probable cause is a question of law when the facts are not in dispute. *Lampos v. Bazar,*

*Inc.*, 270 Or 256, 266-67, 527 P2d 376, 381 (1974). The police have probable cause "at that

moment the facts and circumstances within their knowledge and of which they had reasonably

trustworthy information were sufficient to warrant a prudent man in believing that the petitioner

had committed or was committing an offense." *Beck v. State of Ohio*, 379 US 89, 91 (1964)

Under Oregon law, "probable cause" means "there is a substantial objective basis for believing

that more likely than not an offense has been committed and a person to be arrested has

committed it." ORS 131.007(11).

27 - FINDINGS AND RECOMMENDATIONS

Malice, or "the existence of a primary purpose other than that of securing an adjudication of the claim," *Erlandson v. Pullen*, 45 Or App 467, 478, 608 P2d 1169, 1175 (1980), is a question for the jury. *Gustafson v. Payless Drug Stores Northwest, Inc.,* 269 Or 354, 366, 525 P2d 118, 129 (1974). Although subjective intent of malice is an element, the jury may infer it from the lack of probable cause. *Id*; *Ledford v. Gutoski*, 319 Or 397, 405, 877 P2d 80, 85 (1994).

To support a lack of probable cause and the existence of malice, Thomas relies on the same misrepresentations by Officer Michaels and failure to investigate. However, as discussed above, Thomas has failed to adduce evidence that Officer Michaels lacked probable cause to arrest him or that any defendant acted with malice. As a result, defendants are entitled to summary judgment granted on the state law malicious prosecution claim.

**III.    Intentional Infliction of Emotional Distress Claim**

Defendants argue that the type of conduct at issue in this case does not support a claim for intentional infliction of emotional distress. To establish a claim for intentional infliction of emotional distress, a plaintiff must prove: (1) the "defendant intended to inflict severe mental or emotional distress" or that the distress is certain or substantially certain to result from the defendant's conduct; (2) the defendant's act "in fact caused a plaintiff severe mental or emotional distress"; and (3) the defendant's act "must consist of 'some extraordinary transgression of the bounds of socially tolerable conduct' or exceeded 'any reasonable limit of social toleration.'" *Patton v. J.C. Penney Co.*, *Inc.*, 301 Or 117, 122, 719 P2d 854, 857 (1986), quoting *Hall v. The May Dept. Stores*, 292 Or 131, 135, 137, 637 P2d 126 (1981). If no reasonable juror would differ on the issue of whether defendants' conduct was extreme and outrageous, the matter is an issue for the court to decide. *Pacos v. Clark*, 253 Or 113, 132, 453 P2d 682, 691 (1969).

The undisputed facts demonstrate that defendants were responding to a situation with a reportedly armed and possibly inebriated suspect. Thomas's failure to comply with commands to keep his hands raised once he came out of the house, for whatever reason, created legitimate safety concerns. As a result, it was reasonable for defendants to use force to gain physical control of Thomas. Although the reasonableness of the force used presents factual issues for a jury to decide, Thomas contends that defendants' conduct was so unreasonable that it rises to the level of being considered outrageous and an extraordinary transgression of the bounds of socially tolerable conduct.

The relationship between the parties may have a significant bearing on how to characterize the specific conduct at issue. *McGinty v. Staudenraus*, 321 Or 532, 548, 901 P2d 841, 851 (1995). A defendant's position in relationship to the plaintiff may "impose[] on the defendant a greater obligation to refrain from subjecting the victim to abuse, fright, or shock than would be true in arm's length encounters among strangers." *Id* at 547-48 (quotation omitted).

Thomas contends that the defendants, as police, had a special duty to protect him, citing *Mauri v. Smith*, 135 Or App 622, 676, 901 P2d 247, 256 (1995), *aff'd in part, rev'd in part*, 324 Or 476, 929 P2d 307 (1996). In *Mauri*, the court affirmed a verdict for intentional infliction of emotional distress against two defendant officers who entered the plaintiff's home without a warrant or invitation, allowed a third party to enter over objection to serve papers and did nothing when the third party vilified the plaintiff and his family, although they were well aware of an earlier altercation between the plaintiff and the third party. The court found two contextual factors "especially significant." *Id*, 135 Or at 675, 901 P2d at 255. The first is that "defendants were uniformed police officers" who "exercise special authority and, because of that authority,

they are, in some circumstances, subject to special standards of conduct." *Id*, 135 Or at 675-76,

901 P2d at 255-56. The second factor was the location in the home, a "haven for family." *Id*.

"[C]onduct that is tolerable – or, at least, must be tolerated – on the street, in the market place, or

in the work place, may be intolerable at home." *Id.*

The first factor is present in this case since defendants were uniformed police officers.

However, the second factor is lacking since defendants did nothing within the sanctity of

Thomas's home. Employing force in front of Thomas's house, although in full view of his

neighbors, may be offensive, but does not rise to the level of outrageous conduct. After all, it is

not unusual for police conduct to occur within view of the public. Furthermore, defendants were

not assisting a process server to abuse someone, but instead were responding to a call initiated by

Thomas's physical aggression towards his neighbor, gun in hand.

This case is not comparable to allegations that defendants had engaged in a pattern of

brainwashing, influencing, manipulating , and coercing a disabled brother. *Checkley v. Boyd*,

170 Or App 721, 14 P3d 81 (2000), *review denied*, 332 Or 239, 28 P3d 1174 (2001). It also is

unlike *Turman v. Central Billing Bureau, Inc*., 279 Or 443, 568 P2d 1382 (1977), where the

agent of defendant's collection agency made several calls over a nine-day period to the plaintiff

and used profane and abusive language, shouted at the plaintiff and threatened her, despite the

fact that she advised them that she had worked out a payment arrangement concerning the

underlying bill. It also does not resemble a landlord's attempts to evict aged and disabled tenants

from a trailer park for violating a rental agreement that they were coerced or misled into signing.

*Fitzpatrick v. Robbins*, 51 Or App 597, 62 P2d 910, *review denied*, 291 Or 151, 634 P2d 1346

(1981). Although Thomas was age 65 and hard-of-hearing, those characteristics do not indicate

vulnerability in light of the fact that he was armed in his physical confrontation with his

neighbor, was probably intoxicated, and was not totally compliant with defendants.[13]

The facts here are more similar to those in *Gigler v. Klamath Falls*, 21 Or App 753, 537

P2d 121 (1975), where the plaintiff was ordered to leave a city council meeting for causing a

disruption.  When he refused to leave, the mayor then ordered officers to escort him from the

meeting.  The plaintiff violently resisted and was arrested and forcibly removed from the

building.  The court found that the officers were fulfilling their lawful duty to execute the

mayor's orders:

> While it is shown by the evidence that the mayor indeed lost his temper
> and broke his gavel, it is also shown that his conduct, and that of the
> officers in removing plaintiff from the meeting, had substantial
> justification.  From that point on, plaintiff's resistance prompted the
> treatment accorded him. This was not "outrageous" in the sense described
> in parts of *Pacos* unnecessary to quote here, which is necessary to
> maintain such a cause of action.

*Id* at 764, 537 P2d at 126.

As in *Gigler*, defendants here were acting in the normal course of their duties when they

responded to a potentially dangerous situation created by Thomas, who was a reportedly armed

suspect.  As a result, there is no jury question about intentional infliction of emotional distress,

even though the issue of the reasonableness of the force used by the officers needs to be

submitted to a jury.

///

///

---

[13] Lambert certainly did not consider Thomas to be vulnerable.  To the contrary, she reported in her initial non-emergency call that Thomas had previously threatened her "with physical harm," that "people are physically afraid of this guy," that he "has a big Nazi flag hanging in his garage," and that he "shoots people's dogs."  Plaintiff's Exhibit 1, pp. 6, 8.

**IV.**    **Punitive Damages on § 1983 Claims**

Defendants contend that Thomas is not entitled to recover punitive damages against the individual officers on his § 1983 claims.  A jury may assess punitive damages in an action under § 1983, as in common law tort cases, when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.  *Smith v. Wade*, 461 US 30, 47-48 (1983).  In addition, a jury may impose punitive damages for an act that was "oppressively done."  *Dang v. Cross*, 422 F3d 800, 807-08 (9th Cir 2005).  "[A] defendant's misuse of authority or power or exploitation of a plaintiff's weakness is qualitatively different than a defendant's act that is malicious or in reckless disregard of the plaintiff's rights."  *Id* at 809-10.

Not every intentional violation of a plaintiff's constitutional rights subjects a defendant to punitive damages.  A plaintiff must "make a showing beyond the threshold level of intent required for compensatory liability."  *Ngo v. Reno Hilton Resort Corp.*, 140 F3d 1299, 1304 (9th Cir 1998), *cert dismissed*, 526 US 1142 (1999) (holding that negligent discrimination is insufficient to claim punitive damages).  This requires proof that the defendant "almost certainly knew that what he was doing was wrongful and subject to punishment."  *Id* (citation omitted).  Defendants contend that Thomas cannot meet this threshold requirement.

The only § 1983 claims remaining are those alleging the use of excessive force.  Although most allegations of excessive force are sufficiently outrageous to submit the issue of punitive damages to a jury, a rare exception is *Ward v. City of San Jose*, 967 F2d 280 (9th Cir 1991), in which a jury found liability on a § 1983 claim for the use of excessive force, resulting in death.

Affirming the directed verdict in favor of the police officers on the issue of punitive damages, the court found no evidence "that the officers acted with evil intent." *Id* at 286.

Defendants argue that there is no evidence that they acted with evil intent, with a reckless or callous indifference to the constitutional rights of others, or oppressively. Instead, they quickly used force on a suspect who was armed when last seen. Thomas counters that he is entitled to recover punitive damages because the force used was gratuitous, overwhelming, and oppressive. Once they could discern he was age 65 and hard-of-hearing, they must have been aware that the type of force used could and did cause serious and significant injuries. He also contends that the incident terminated only due to the intervention of a neighbor and that after it was over, defendants attempted to cover up their misdeeds.

As discussed above, the evidence is lacking that Officer Michaels misrepresented what Lambert told her or that defendants intentionally failed to reveal exculpatory witnesses. However, a person could reasonably conclude that the force used was not only excessive, but was the type of overwhelming and oppressive force which punitive damages are designed to deter in such circumstances. The discretion to award punitive damages is largely within the realm of the jury. *See Kennedy v. Los Angels Police Dep't*, 901 F2d 702, 707 n3 (9th Cir 1989). Whether the force used in this situation justifies an award of punitive damage should be left to the jury.

## V.    <u>John Doe Defendants</u>

Defendants seek dismissal of the John Doe defendants because they have not yet been identified and served nearly two years after the filing of this case on July 7, 2005. Thomas does not contest this portion of defendants' motion. Therefore, the Does 1-20 should be dismissed as defendants.

## RECOMMENDATIONS

For the reasons set forth above, Plaintiff's Motion for Partial Summary Judgment Against Defendants (docket # 56) should be DENIED and Defendants' Motion for Summary Judgment (docket # 60) should be GRANTED in favor of defendants Taylor, Gjovik and Michaels on the First Cause of Action for a violation of § 1983 based on the seizure and the Sixth and Seventh Causes of Action for malicious prosecution, GRANTED in favor of defendants Does 1-20, and DENIED as to punitive damages.

As a result, the remaining claims left for trial are those portions of Thomas's claims alleging the use of excessive force against defendants Taylor, Gjovik and Michaels in the First Cause of Action (violation of § 1983), Third Cause of Action (Assault and Battery), and Fifth Cause of Action (Negligence). The claims against the City of Portland in the First and Second Causes of Action based on municipal liability under § 1983 have been bifurcated based on the City of Portland's willingness to admit to respondeat-superior liability upon a finding of a constitutional violation by any individual defendant (docket # 43).

## SCHEDULING ORDER

Objections to the Findings and Recommendation, if any, are due July 17, 2007. If no objections are filed, then the Findings and Recommendation will be referred to a district judge and go under advisement on that date.

///

///

///

///

34 - FINDINGS AND RECOMMENDATIONS

If objections are filed, then a response is due within 10 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district judge and go under advisement.

DATED this 29th day of June, 2007.

/s/  Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge